R. W. STEELE, Appellant, v. F. J. KLUTER, Appellee.

REFORMATION OF INSTRUMENTS: Mutual Mistake—Conflicting
1 Testimony. Circumstances and attending facts bearing on the issue of reformation because of mutual mistake may be ample to establish such mistake even though the parties are hopelessly at war in their personal testimony relative to such issue.

REFORMATION OF INSTRUMENTS: Negligence—Effect. Negli-
2 gence in signing an instrument is not necessarily fatal to a plea for reformation, especially when the equities are strongly in favor of the pleader.

Headnote 1:  34 Cyc. p. 988.  Headnote 2:  34 Cyc. pp. 948, 950.

Headnote 1:  23 R. C. L. 320, 321.  Headnote 2:  23 R. C. L. 352.

*Appeal from Sioux District Court.*—C. C. BRADLEY, Judge.

JULY 1, 1927.

Suit in equity, to enforce performance of a written contract of alleged rescission. The plaintiff claims a right of recovery thereunder of the amount paid under the contract thus rescinded. The real defense consisted of a cross-bill filed by the defendant, praying the reformation of the written contract sued on, on the ground that it failed to express the real intent and contract of the parties. The district court awarded decree to the defendant, reforming the contract, and dismissed the plaintiff's petition accordingly. The plaintiff has appealed.— *Affirmed.*

*J. A. Berry,* for appellant.

*Van Oosterhout & Kolyn,* for appellee.

EVANS, C. J.—I. The record before us presents only a fact case. The fighting issue is upon the cross-bill, and all the evidence is concentrated thereon. The question is whether the forfeiture of the certain contract then existing between the parties was mutually intended, or whether it was intended to work a full rescission thereof. The writing, as executed, would bear the interpretation put upon it by the plaintiff as a contract of rescission. The burden was upon the defendant to show that the contract in that respect failed to express the intent of the parties, by reason of mutual mistake. The burden thus resting upon the defendant is substantial, rather than merely formal, and must be satisfactory and convincing to the mind of the court.

1. REFORMATION OF
INSTRUMENTS:
mutual mistake:
conflicting
testimony.

Prior to any transaction between these parties, the defendant, Kluter, had, in May, 1919, purchased from one Sherman, by written executory contract, a certain farm of 160 acres, at $350 per acre. The contract entered into between the defendant, Kluter, and Sherman appears in this record as Exhibit A. It was in the ordinary form of such contracts, making time the essence of the contract, and providing for strict performance and for forfeiture in case of default. It acknowledged a down payment of $2,500, and provided for a further payment to be made on March 1, 1920, of $12,500. The balance of the purchase price, $41,000, was to be paid on March 1, 1930, whereas interest thereon at 5 per cent was to be paid annually, on the first of March each year. The vendee was to take possession on March 1, 1920, subject, however, to an existing lease for one year, at $14.50 per acre, which was to be assigned, together with the rental to accrue thereunder, by the vendor to the vendee.

On January 8, 1920, the plaintiff offered to purchase the land in question from the defendant, by assuming his contract and paying him a profit thereon of $2,000. This offer being accepted by the defendant, the plaintiff paid to him the sum of $4,500. Such sum was intended to cover the $2,500 payment already made by the defendant to Sherman, and the $2,000 profit accruing to the defendant. Pursuant to such oral contract, the following indorsements were made upon the written contract, Exhibit A:

"Ireton, Iowa, January 8th, 1920.

"For and in consideration of the sum of twenty-five hundred dollars, the receipt of which is hereby acknowledged, J hereby assign all of my right and title to the within contract to R. W. Steele.

"F. J. Kluter

"Mrs. Fred Kluter.

"I, R. W. Steele, hereby accept the assignment of the within contract and agree to assume and pay all sums therein as they come due and to fully fulfill all the agreements made by said F. J. Kluter therein.

"R. W. Steele."

With these assignments thereon, the contract was then delivered by defendant, Kluter, to the plaintiff. On March 1, 1920, the plaintiff made the payment then due, of $12,500. On March 1, 1921, he paid the annual interest then due, $2,050. In January, 1922, he discovered that his ability to meet the annual payment of interest on March 1st was very doubtful, and he so advised the defendant, Kluter. Efforts were immediately made by him and Kluter jointly to induce Sherman to take back the land for the unpaid amount due on the contract. This effort was of no avail. They thereupon offered to Sherman a "bonus" of $6,000, but this offer was of no avail. Some negotiations followed between plaintiff and defendant, whereby the defendant agreed to loan to the plaintiff a portion of the amount necessary to pay the interest. On March 1, 1922, however, the plaintiff notified the defendant that he could not make payment of the interest due on that date, and he then and there wholly failed to pay any part thereof. The defendant thereupon was compelled to pay the same to Sherman, to protect his own obligation. Thereupon, the defendant requested the plaintiff to surrender to him the possession of the contract, Exhibit A, the apparent purpose of such demand being that he would proceed to protect himself, under its forfeiture provision. As to the details of what transpired thereafter between the parties, the evidence is in conflict, the principal witnesses being the two litigants. Under the evidence of the defendant, the plaintiff came to him on March 14th, at his home, where he was under quarantine, and offered to "step out," and turn the

property and the contract over to the defendant, if the defendant would release him from further obligation, and if he would lease him the premises for $1,100 rent for the year 1922. This offer was accompanied with the statement by the plaintiff that he wanted no litigation. The defendant assented to this offer. Thereupon, the plaintiff asked the defendant if he, plaintiff, might have his attorney prepare a writing, to show that he was "released" from the contract; and the defendant assented to this. On March 18th, the plaintiff returned to the home of the defendant, who was still under quarantine, with such writing, and the defendant signed the same. According to defendant's testimony, this oral offer of the plaintiff's to the defendant was substantially identical with the offer made by both of them to Sherman in January, which offer had been rejected by Sherman. The testimony of the plaintiff, as a witness, puts a different version on the oral negotiations. This testimony was, in substance, that the offer made by him to the defendant was that he would agree to a "mutual rescission," which would put the parties "in statu quo." The terms here put under quotation marks are the terms used in the writing, and the plaintiff's evidence supports the writing in said literal terms.

In the presence of this conflict in the oral testimony between these two litigants, the circumstances surrounding them become very significant, and furnish very satisfactory indication of where the truth lies.

This farm was bought at the peak of the inflation period, and the sale was at a peak price. Several witnesses testified to the value of this land in January and March, 1922. This testimony gave a range of values from $150 to $180 per acre. Only one witness placed the value as high as $180. On March 1, 1922, the incumbrance existing pursuant to the Sherman contract, including principal and interest and approximately $150 of taxes, amounted to $43,200. This was at the rate of $270 per acre. This was concededly more than the land was worth, and is a sufficient explanation of Sherman's refusal to take it back, even with an additional payment of $6,000. Kluter was bound to the payment of the full sum to Sherman, regardless of the value of the land. So far as appears from the record, he was financially responsible. The plaintiff was likewise obligated to Kluter to pay the full amount, regardless of the value

of the land. But he was lacking in financial ability to meet the obligation. It is not claimed by plaintiff that anything was ever said in terms between him and Kluter, as to Kluter's paying back to him any part of the moneys which he had already sunk in the enterprise. No word was ever said between them indicating any understanding on the part of either of them that Kluter was to pay back to the plaintiff any part of the moneys paid by him. When the plaintiff produced the writing for the signature of the defendant, Kluter, and obtained the same, nothing was said then about any repayment by Kluter to the plaintiff. Plaintiff asked no questions on that subject; whereas his petition claims a return of principal and interest amounting to approximately $20,000. No claim or suggestion of that kind was made, either on March 14th or on March 18th. On the date that the writing was signed, Kluter also signed a lease of the premises to Steele, as lessee, for the year 1922, for a rental of $1,100. At the same time, Steele signed two notes for $550 each, for such rental. Now, if he understood that Kluter was owing him $20,000, why should he sign notes for the rent? It is not claimed by the plaintiff that he ever, in any conversation preceding or following the signing of the writing, made any demand or request for the money alleged to be due him; nor did he make any inquiry as to when or how soon the defendant could pay it. The first demand made upon the defendant was made by plaintiff's attorney, who knew nothing concerning the oral negotiations between the parties, but relied apparently upon the contract before him. If the version of the plaintiff, as a witness, be accepted, then Kluter in effect repurchased from him such farm at a price of $350 per acre, knowing that it was worth not more than $180 per acre. He was under no pressure or obligation to pay such price. If he agreed to it, he did so voluntarily, and after no further discussion of details than the assenting to the offer made by the plaintiff. The relative reasonableness or unreasonableness of the respective versions of the parties is proper to be considered, in weighing the testimony. It is particularly persuasive in this case.

In order to maintain consistency as between his oral evidence and the terms of the contract, the plaintiff has been driven to great extremity, and has committed himself to most

incredible statements, which greatly impair the value of his evidence as a whole.

The legal effect of the indorsements made and signed by these two parties upon the Sherman contract, Exhibit A, was to incorporate the terms of the Sherman contract into their own. See *Equitable Life Ins. Co. v. Taft Co.*, 192 Iowa 934. As between Kluter and Steele, Kluter was the vendor. Steele assumed and bound himself to pay the installments due Sherman, and became primarily liable therefor, as between him and Kluter. When Steele defaulted, on March 1, 1922, he subjected himself at once to a forfeiture proceeding, which could have been summarily had. He recognized that fact. Was it probable, therefore, that Kluter would voluntarily pay him $20,000 for surrendering possession? If Steele was willing to give up the land to Sherman, in order to be released from further obligation, is it probable that he would insist upon a payment of $20,000 from Kluter, in order to surrender the land to him? If Kluter was willing to surrender the land to Sherman, and to add the sum of $6,000 to the previous payments, is it probable that he would pay $20,000 to Steele, in order to acquire the land? These probabilities have their corroborating value, and they tend convincingly to the support of the version of the oral negotiations testified to by the defendant. Such was the view of the trial court, and we are in accord therewith.

II. Considerable emphasis is laid upon the alleged negligence of the defendant in failing to discover from a reading of the contract the full purport thereof, as he has discovered it since.

It is true that negligence may prove fatal to one who puts his name to a writing, without ascertaining the contents thereof. But even negligence is a question of degree of care. The line of demarcation between reasonable diligence and some degree of negligence is not always clearly defined. Generally speaking, it can be said that some degree of negligence enters into all cases where a writing signed by the parties fails to express their real intention. It is not the purpose of equity to put a premium on negligence, nor to exercise its powers to cure the result of mere negligence. But even negligence may have its mitigations, and failure to discover is not always inexcusable in equity; and this

2. REFORMATION OF INSTRUMENTS: negligence: effect.

is especially so as between the original parties to the transaction. Where the equities are clear, the court will not lightly refuse relief because of some degree of attendant negligence. The rule in that regard is considered by us in *Betz v. Swanson,* 200 Iowa 824. We are impressed that the mistake in this case was really mutual, and that there was no intentional fraud on the part of the plaintiff in the first instance. The attorney who drew the writing was not familiar with the oral negotiations, and naturally drew the same to the full protection of his own client. The words "mutual rescission" and *"in statu quo"* were unfamiliar terms to the parties, and looked harmless enough. Far be it from a layman to question the propriety of legal terms, when incorporated by an attorney. True, the plaintiff testified that he understood the meaning of the terms, and that these were the terms which he used in conversation with Kluter. If this be so, then he used the terms to deceive. These terms are not a part of the common parlance of laymen. The plaintiff's evidence at this point is so weighted with improbability as to impair the credibility of all his testimony. If he could have taken the risk of candor at this point and at some others, he might at least have strengthened his evidence as a whole.

On the whole, we are convinced that the mistake was mutual. The plaintiff is in equity, seeking to give the contract an executory character, and to enforce the same accordingly. We think he is in no position to resist the equities of the case with a plea of negligence.

The decree of the lower court reforming the contract and dismissing the petition is affirmed.—*Affirmed.*

DE GRAFF, ALBERT, MORLING, and KINDIG, JJ., concur.